## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


| | | |
|---|---|---|
| TARA D. ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17cv1145 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Tara D. Ross, brought this action under the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 7, 9; see also Docket Entry 8 (Plaintiff's Memorandum); Docket Entry 10 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB. (Tr. 139-47.) Upon denial of that application initially (Tr. 74-77) and on reconsideration (Tr. 83-86), she requested a hearing de novo before an Administrative Law Judge (the "ALJ") (see Tr. 87-98).

Plaintiff, her representative, and a vocational expert (the "VE") attended the hearing. (See Tr. 31-51.) The ALJ subsequently ruled Plaintiff not disabled under the Act. (Tr. 15-30.) The Appeals Council denied her request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2014.

2.    [Plaintiff] did not engage in substantial gainful activity during the period from her amended onset date of August 4, 2013[,] through her date last insured of December 31, 2014.

3.    Through the date last insured, [Plaintiff] had the following severe impairments:   depression, bipolar disorder[,] and obesity.

. . . .

4.    Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

5.    . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity [(at times, the "RFC")] to perform a full range of work at all exertional levels but with the following nonexertional limitations: no climbing or work around heights or dangerous equipment, occasional exposure to people, low stress and [low[1]] production environment with no rigid quota and

---

[1]  The ALJ used a single "low" to modify both "stress" and "production" in this description of Plaintiff's RFC (see Tr. 22), but elsewhere in his opinion (see

(continued...)

simple, routine and repetitive tasks [(collectively, at times, "SRRTs")].

. . . .

6.  Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . . .

10.  Through the date last insured, considering [Plaintiff's] age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . . .

11.  [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from August 4, 2013, the amended onset date, through December 31, 2014, the date last insured.

(Tr. 20-27 (bold font and parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

---

[1] (...continued)
Tr. 26) he clarified that the RFC limitation involved "a low stress, low production environment with no rigid quota and occasional exposure to people" (Tr. 25-26), and his question to the VE similarly included a limitation to a "low production work environment" (see Tr. 50 (asking about jobs "that would accommodate the following limitations . . . work that would be in a low stress, low production work environment where there are no rigid production or quotas required in the performance of, again, simple, routine, repetitive tasks")).

Plaintiff has not established entitlement to relief under this extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (brackets and internal quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted).  "Where conflicting evidence

4

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's]

---

[2] The "Act comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (citations omitted).

medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process (the "SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (citation omitted).

is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both . . . [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry her "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

---

[4] The "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require the RFC to reflect the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (emphasis and internal quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. The "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant at step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process,
(continued...)

## B.  Assignments of Error

Plaintiff asserts that the ALJ erred (1) in his assessment of Plaintiff's "Mental RFC" (at times, the "MRFC") (Docket Entry 8 at 1 (bold font omitted)), (2) in his "RFC Determination" (id. (bold font omitted)), and (3) in his evaluation of "[Plaintiff's] Testimony" (id. at 2 (bold font omitted)).  Defendant contends otherwise and urges that substantial evidence supports the ALJ's findings.  (See Docket Entry 10.)

### 1.  The Mental RFC

In Plaintiff's first assignment of error, she alleges that "the ALJ d[id] not give a complete function-by-function analysis of the nonexertional mental functions associated with [Plaintiff's] difficulties in the broad areas of functioning and d[id] not make a complete finding as to [Plaintiff's MRFC]" (Docket Entry 8 at 2-3 (bold font omitted)), in violation of Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015).  (See Docket Entry 8 at 2-8.)  In particular, Plaintiff argues that the MRFC fails to "reflect limitations consistent with the ALJ's finding of a moderate limitation in concentration, persistence, and pace" (collectively, at times, "CPP").  (Id. at 3.)  Plaintiff further asserts that the ALJ "did not address the particular limitations that comprise the agency's mental RFC findings."  (Id. at 7.)  These arguments lack merit.

---

[5] (...continued)
review does not proceed to the next step.").

a.  Relevant Procedures

As an initial matter, at steps two and three of the SEP, the ALJ must assess the degree of functional limitation resulting from Plaintiff's mental impairments pursuant to criteria in the corresponding mental disorders in the listing of impairments. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00 (2016); 20 C.F.R. § 416.920a(b)(2) & (c)(2). As relevant to the instant case, paragraph B of Listing 12.04 ("Affective Disorders") contains four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04B (2016); see also 20 C.F.R. § 416.920a(c)(3) (2016). The ALJ's decision must include a specific finding of the degree of limitation in each of those functional areas. 20 C.F.R. § 416.920a(e)(4). However, the paragraph B criteria limitations do not constitute an RFC assessment. Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *4 (July 2, 1996). Rather, the ALJ uses those limitations to evaluate the severity of Plaintiff's mental impairments at steps two and three of the SEP. Id.

"The mental RFC assessment used at steps 4 and 5 of the [SEP] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C,"

id., and includes consideration of Plaintiff's "abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting," id. at *6. Thus, the regulations do not require the ALJ to incorporate word-for-word the limitations found in evaluating the severity of mental impairments into either the RFC or any hypothetical question. See Yoho v. Commissioner of Soc. Sec., No. 98-1684, 1998 WL 911719, at *3 (4th Cir. Dec. 31, 1998) (holding ALJ bears no obligation to transfer paragraph B findings verbatim to hypothetical question(s)); accord Patterson v. Astrue, No. 1:08cv109, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009).

b.  Plaintiff's Contentions

Here, Plaintiff maintains that the ALJ failed to account for her moderate deficits in CPP in the MRFC determination.  (See Docket Entry 8 at 2-8.)  More specifically, Plaintiff argues that, pursuant to Mascio, "the mental RFC must reflect limitations consistent with the ALJ's finding of a moderate limitation in [CPP]," but, "[a]lthough the ALJ's RFC included several elements, they do not correspond with the necessary limitations in [CPP]." (Id. at 3.)  According to Plaintiff, "[t]he ALJ did not fully determine or discuss in the decision [Plaintiff's] ability to stay on task due to her moderate difficulties with [CPP]."  (Id. at 7.)

Plaintiff further faults the ALJ for according "great weight" to the opinions of the state agency psychological consultants (Tr. 25), who each opined that Plaintiff "may have some deficits in sustained concentration" (Tr. 58, 70), but then allegedly failing to incorporate those opinions into the MRFC. (See Docket Entry 8 at 7.) Finally, Plaintiff asserts that the ALJ "remained silent on the issues of concentration and persistence" (id. at 5) and his "treatment of pace is insufficient, because [he] did not define 'production environment'" (id. at 6). Plaintiff's arguments do not warrant relief.

The United States Court of Appeals for the Fourth Circuit has held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." Mascio, 780 F.3d at 638. However, as a neighboring district court has explained, "Mascio does not broadly dictate that a claimant's moderate impairment in [CPP] always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . ." Jones v. Colvin, No. 7:14cv273, 2015 WL 5056784, at *10 (W.D. Va. Aug. 20, 2015) (emphasis added). As such, "[a]n ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source

statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court." Id. at *12. Here, the ALJ's decision provides a sufficient explanation as to why limitations in the RFC to "a low stress, low production environment with no rigid quota" (Tr. 25) sufficiently accounted for Plaintiff's moderate limitation in CPP.

First, the ALJ discussed Plaintiff's description of her daily activities. (See id.; see also Tr. 42-49.) In so doing, the ALJ found it "significant[]" that, "at the hearing[, Plaintiff] testified that her activities of daily living include reading (an average of 5-8 hours), watching a great deal of television (an average of 3-5 hours per day)[,] and researching information on the internet." (Tr. 25; see Tr. 43-44, 47-49.) The ALJ further noted that Plaintiff "did not indicate having any problems following along when she reads or watches television. She also said that she spends about 1-2 hours daily on the computer, researching and reading material." (Tr. 21; see Tr. 43-44, 47-49.) Plaintiff's ability to maintain such sustained concentration provides substantial evidence for the ALJ's RFC finding. See, e.g., Shank v. Berryhill, No. 3:17cv572, 2018 WL 549188, at *14 (S.D. W. Va. Jan. 3, 2018) ("Moreover, the ALJ examined [the plaintiff's] activities, indicating that despite her claims of poor concentration, [the plaintiff] was able to spend long hours playing computer games and watching television. . . . The ALJ carefully

built a logical and accurate bridge from the evidence to his conclusion" that the plaintiff's "symptoms were not disabling."), report and recommendation adopted, No. CV 3:17-572, 2018 WL 539333 (S.D. W. Va. Jan. 24, 2018).

Second, the ALJ summarized Plaintiff's mental health treatment, making the following pertinent observations:

- Salisbury Psychiatric Associates' medical records reflect that Plaintiff initially presented in December 2010 following a November 2010 suicide attempt, reporting "mood swings, decreased appetite, low energy and guilt. She associated her mental state with marital problems." Thereafter, "[she] was started on [various medicines] for the purpose of reducing her depression," and, "based on the progress notes[,] the [subsequent] changes in [Plaintiff's] medication regimen were effective in controlling her symptoms. Even more significantly, the progress notes show a pattern of improvement with treatment. Specifically, in May 2011 [Plaintiff] reported that she felt better, in June 2011 and October she reported improved mood and in May 2012 she described her mood as pretty good (Exhibit 9F)." (Tr. 23; see also Tr. 361-90);

- When Plaintiff first presented for mental health treatment at Rowan Psychiatric & Medical Services in August 2013, "she reported being off her medications since January 2013. In addition, [Plaintiff] reported separating from her husband in January 2013 causing a financial burden resulting in [a] four-day [psychiatric] hospital stay in May 2013." Her "mental status examination revealed depressed mood, congruent and constricted affect, and anxious behavior with a guarded attitude." However, her behavior, attention/concentration, thought processes, and thought content "were normal," she possessed "the ability to abstract," "[h]er judgment and insight were good," and she had "no evidence of a memory impairment, delusions[,] or suicidal and/or homicidal ideation." (Tr. 23-24; see also Tr. 211-14);

- "When [Plaintiff] returned in September 2013, she reported that her medications were helping but she continued to have problems with depression and difficulty sleeping. Nevertheless, her mental status examination revealed no abnormalities (Exhibit 2F)." The following month, her medication dosages "were increased" and "in February 2014, bipolar disorder was added to [her] diagnoses. Nevertheless, [Plaintiff's] objective examinations have continued to reveal no more than moderate but mostly mild symptoms." For instance, at an interval visit in September 2014, Plaintiff "reported occasional suicidal thoughts with no plans to act on them and some anxiety but she also reported that she was doing well with stable weight and improved sleep. Objectively, [Plaintiff's] mood and affect were normal, memory within normal limits, concentration and judgment intact and fund of knowledge adequate. There was no evidence of psychosis. Her thought process was logical and goal directed (Exhibit 7F). None of the subsequent records prior to the date last insured shows any significant or persistent changes in these objective findings." (Tr. 24; see also Tr. 207-10, 348-56); and

- "[A] review of the treatment notes reveals that when [Plaintiff] was actively engaged in regular, consistent mental health treatment, her functioning vastly improved. The problem had been consistency and commitment to treatment." (Tr. 24-25.)

Third, the ALJ discussed and weighed the opinion evidence as it related to Plaintiff's ability to function mentally. (See Tr. 25.) Notably, the ALJ gave "great weight" to the opinions of the state agency psychological consultants (id.), who each opined that, despite moderate deficit in CPP (see Tr. 58, 69-70), Plaintiff "appears to retain capacity for SRRTS w[ith] MRFC limitations herein" (Tr. 57; see also Tr. 68 ("She appears to retain capacity for work-related tasks w[ith] MRFC limitations

herein.")).  In regard to any MRFC limitations, the consultants further found that "[Plaintiff] may have some deficits in sustained concentration, but is capable of carrying out instructions and has the ability to maintain attention [and] concentration for 2 hours at a time as required for the completion of work-related tasks." (Tr. 58, 70.)  Thus, although Plaintiff faults the ALJ for "not address[ing] the particular limitations that comprise the agency's mental RFC findings" (Docket Entry 8 at 7), this argument overlooks the fact that the consultants ultimately concluded that Plaintiff remained capable of performing SRRTs, as well as of carrying out instructions and "maintain[ing] attention [and] concentration for 2 hours at a time as required for the completion of work-related tasks" (Tr. 58, 70).  These considerations foreclose relief. See Sizemore v. Berryhill, 878 F.3d 72, 81 (4th Cir. 2017) (explaining that a doctor's opinion that a plaintiff "would generally be able to maintain attention for at least two hours at a time as needed to do simple, routine tasks" provided substantial support for the ALJ's finding that the plaintiff could "stay on task" in performing simple work (brackets, emphasis, and internal quotation marks omitted)).

Fourth, the ALJ's restriction to a "low production environment with no rigid quota" (Tr. 26) in the RFC "reasonably related to a moderate limitation in Plaintiff's ability to stay on task," Grant v. Colvin, No. 1:15cv515, 2016 WL 4007606, at *6 (M.D.N.C. July 26,

2016), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 21, 2016)

(Osteen, C.J.).  In that regard:

> [T]he weight of authority in the circuits that rendered
> the rulings undergirding the Fourth Circuit's holding in
> <u>Mascio</u> supports the view that the non-production
> restriction adopted in this case sufficiently accounts
> for [the p]laintiff's moderate limitation in CPP.
> Moreover, that approach makes sense.  In <u>Mascio</u>, the
> Fourth Circuit held only that, when an ALJ finds moderate
> limitation in CPP, the ALJ must <u>either</u> adopt a
> restriction that addresses the "staying on task" aspect
> of CPP-related deficits (which a restriction to simple
> tasks does not, at least on its face) <u>or</u> explain why the
> CPP limitation of that particular claimant did not
> necessitate a further restriction regarding "staying on
> task."  Where, as here, the ALJ has included a specific
> restriction that facially addresses "moderate" (not
> "marked" or "extreme," <u>see</u> 20 C.F.R. § 416.920a(c)(4))
> limitation in the claimant's ability to stay on task,
> i.e., a restriction to "non-production oriented" work,
> <u>Mascio</u> does not require further explanation by the ALJ,
> at least absent some evidentiary showing by the claimant
> (not offered here) that he or she cannot perform even
> non-production-type work because of his or her particular
> CPP deficits.

<u>Grant</u>, 2016 WL 4007606, at *9 (emphasis in original); <u>see also</u> <u>id.</u>

at *7-9 (discussing authority addressing "non-production"

restrictions).

Finally, Plaintiff faults the ALJ for failing to "define

'production environment.'" (Docket Entry 8 at 6.)  More

specifically, Plaintiff maintains that

> [t]he ALJ did not explain if the limitation was to only
> production environments with rigid quotas or if it is for
> all production environments *and* for jobs with rigid
> quotas.  Without defining the parameters of the work,
> there is no way for this Court to know what assumptions
> the vocational witness made about the work pace intended
> by the ALJ.

(Id. (emphasis in original).)  This argument likewise falls short.

To begin, the ALJ actually limited Plaintiff to "a low stress, low production environment with no rigid quota" (Tr. 26; see also Tr. 50 (posing hypothetical regarding "work that would be in a low stress, low production work environment where there are no rigid production or quotas required in the performance of, again, simple, routine, repetitive tasks")) rather than an unconstrained "production environment."[6]  Second, the VE expressed no difficulty understanding the meaning of "low production work environment" in the ALJ's hypothetical (see Tr. 50), and Plaintiff's representative, despite an opportunity for cross-examination, declined to question the VE on this issue (see Tr. 50-51). Accordingly, Plaintiff cannot obtain relief on this ground.  See Pierson v. Commissioner of Soc. Sec., No. 1:12cv126, 2013 WL 428751, at *7 (S.D. Ohio Feb. 1, 2013) (finding "that despite the purported vagueness of the term ['superficial'], any error would be harmless as the VE was able to understand the term and testified that there were jobs in the local and national economy that [the] plaintiff could perform"), report and recommendation adopted, No. 1:12cv126, 2013 WL 791875 (S.D. Ohio Mar. 4, 2013).

Under these circumstances, the ALJ adequately explained why limitations to "a low stress, low production environment with no

---

[6]  This fact materially distinguishes this aspect of the ALJ's RFC in this case from the undeveloped "production rate" and "demand pace" terms found wanting in Thomas v. Berryhill, __ F.3d __, __, 2019 WL 193948, at *3 (4th Cir. 2019).

rigid quota" (Tr. 26) sufficiently accounted for Plaintiff's moderate limitation in CPP.  The Court should therefore reject Plaintiff's first assignment of error.

## 2. The RFC Determination

In Plaintiff's second assignment of error, she argues that the ALJ failed to adequately address her "stress-related limitations." (Docket Entry 8 at 9.)  In Plaintiff's view, "[t]he ALJ employs flawed reasoning in equating production quotas with work stress" (id.), for "there is no record of difficulties with work quotas or production demands[ and t]he ALJ did not explain how [Plaintiff's] difficulties are alleviated by the freedom from production environments or rigid quotas" (id. at 10).  (See also id. at 9 ("As in *Mascio*, the ALJ's decision in this matter is lacking in any analysis necessary for court review.").)  In sum, Plaintiff maintains, "[t]he error in this case is the failure to conduct an individualized inquiry." (Id. at 10.)[7]  This argument lacks merit.

_____

[7] Plaintiff asserts in the caption of her second assignment of error that "the ALJ did not explain how he found [her] capable of medium [sic] level work on a sustained basis in the [RFC]."  (Id. at 8 (bold font omitted).)  She later contends that, "[i]n conclusory fashion, the ALJ stated [that Plaintiff] was capable of working at all exertional levels on a regular and continuing basis." (Id. at 10.)  Finally, Plaintiff argues that "[t]he ALJ concluded that [Plaintiff] could perform work and summarized evidence that he found credible, useful, and consistent.  But the ALJ did not explain how he concluded — *based on this evidence* — that [Plaintiff] could actually perform the tasks required." (Id. at 11 (emphasis in original).)  To the extent that Plaintiff seeks to raise an argument regarding some physical limitations distinct from her stress-related contentions, such argument fails.  As an initial matter, Plaintiff based her disability claim strictly on mental limitations.  (See Tr. 157 (identifying conditions that limit work ability as "1. Bipolar disorder 2. suicidal 3. sever[e] depression" (bold font omitted)); see also Tr. 160 (answering "No" to question of whether she has seen or has an appointment scheduled with a medical professional "[f]or any physical condition(s)" (bold font omitted)).)
(continued...)

First, the ALJ did not "equat[e] production quotas with work stress" (id. at 9) nor purport to "alleviate[]" Plaintiff's stress-related "difficulties" by "free[ing her] from production environments or rigid quotas" (id. at 10).  Rather, the ALJ limited her to a "low stress" work environment with "occasional exposure to people."  (Tr. 22, 26 (bold font omitted).)  The ALJ additionally limited her to "simple, routine[,] and repetitive tasks."  (Tr. 22, 25 (bold font omitted).)  Plaintiff does not acknowledge these restrictions, let alone challenge their sufficiency in addressing her stress-related limitations.  (See Docket Entry 8 at 8-11.)

Moreover, in formulating these restrictions, the ALJ "buil[t] an 'accurate and logical bridge' from the evidence" that the ALJ "found credible, useful, and consistent . . . . to his conclusion about [Plaintiff's RFC]" (id. at 11).  The ALJ examined Plaintiff's description of daily activities and social functioning (see Tr. 21, 25), noting that, although Plaintiff "said she does not go out often" (Tr. 22-23; see Tr. 44-45) and "said that she does not trust others and has difficulty in crowds" (Tr. 22; see Tr. 44), as she "feel[s] that everyone is looking at her" (Tr. 21; see Tr. 45), Plaintiff also reported that "she loves playing and talking to her

[7] (...continued)
Nevertheless, the ALJ considered her obesity and found that it did not limit her ability to work.  (See Tr. 24 ("The [ALJ] has also considered [Plaintiff's] obesity in formulating [her RFC] and concludes that there is no evidence that prior to the date last insured obesity would have precluded the performance of substantial gainful work activity.").)  Plaintiff has identified no evidence in the record that undermines that conclusion.  (See Docket Entry 8 at 8-11.)

children and grandchildren and gardening," "she drives herself to the grocery store and doctor's appointments" (Tr. 25; see Tr. 42, 46-47), and, "[i]n June 2014[, she] reported that she walks everyday" (Tr. 25; see Tr. 258). The ALJ also examined Plaintiff's medical records (Tr. 23-24), noting, inter alia, that, at her December 2010 initial evaluation, "[Plaintiff] associated her mental state with marital problems," and, at her August 2013 evaluation, Plaintiff "reported being off her medications since January 2013" and "separating from her husband in January 2013 causing a financial burden resulting in the four-day hospital stay in May 2013." (Tr. 23; see also Tr. 386-90, 211-14.)

The ALJ then concluded that

> [t]here is no doubt that prior to the date last insured, [Plaintiff] suffered from "severe" mental health problems. Furthermore, she required frequent monitoring and medication. However, the evidence demonstrates that despite [Plaintiff's] mental health problems, prior to the date last insured she was still able to take care of her basic personal care needs, think, communicate, act in her own interest and get along with others. Overall, the records show that [Plaintiff] reported episodic exacerbations due to psychosocial stressors such as financial stress, but mostly due to her tumultuous relationship with her husband as opposed to depression and anxiety to the degree of precluding all work. As such, the [ALJ] concludes that[,] although prior to the date last insured, [Plaintiff] was unable to perform work, which is of high stress and was precluded from work involving complex or detailed tasks, which is required of skilled work, she was not precluded from work involving simple work-related instructions and directions and simple routine tasks.

(Tr. 24.) The ALJ further found that Plaintiff's description of her daily activities, including her interactions with her family,

"show that[,] prior to date last insured, when [Plaintiff] was compliant with treatment, she was capable of sustaining basic work activities." (Tr. 25.) Finally, based on this evidence, the ALJ "conclude[d] that[,] despite [Plaintiff's] mental health problems, prior to the date last insured[, Plaintiff] retained the ability to perform simple, routine and repetitive tasks at any exertional level in a low stress . . . environment with . . . occasional exposure to people." (Tr. 25-26.)

In short, "the ALJ considered and discussed the record at length and built a substantial bridge between the evidence in the record and the RFC," providing "no basis for reversal under Mascio." Stutts v. Berryhill, No. 1:17cv586, 2018 WL 3764265, at *5 (M.D.N.C. Aug. 8, 2018) (Peake, M.J.), report and recommendation adopted, No. 1:17cv586, 2018 WL 4374928 (M.D.N.C. Sept. 13, 2018) (Biggs, J.). The Court should therefore reject Plaintiff's second assignment of error.

### 3. Plaintiff's Testimony

The ALJ must employ a two-step process in evaluating a claimant's statements regarding her symptoms. See Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3 (Oct. 25, 2017) (the "SSR 16-3p"); see also 20 C.F.R. § 404.1529. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected

to produce an individual's symptoms, such as pain."  SSR 16-3p,
2017 WL 5180304, at *3.  If, as here, the ALJ finds that the
claimant satisfies this step (see Tr. 23), the analysis then turns
to an assessment of the intensity and persistence of the claimant's
symptoms, as well as the extent to which those symptoms affect her
ability to work.  See SSR 16-3p, 2017 WL 5180304, at *3.  In making
that determination, the ALJ must "examine the entire case record,
including the objective medical evidence; an individual's
statements about the intensity, persistence, and limiting effects
of symptoms; statements and other information provided by medical
sources and other persons; and any other relevant evidence in the
individual's case record."  Id. at *4.  In this case, Plaintiff
fell short at the second step, as the ALJ concluded that
"[Plaintiff's] statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely consistent with
the medical evidence and other evidence in the record for the
reasons explained in th[e ALJ's] decision."  (Tr. 23.)  Plaintiff
disputes this assessment.  (See Docket Entry 8 at 11-18.)

More specifically, Plaintiff argues that "the ALJ did not give
legally sufficient reasons supported by substantial evidence for
finding [her] testimony not entirely consistent."  (Id. at 11 (bold
font omitted).)  In particular, Plaintiff asserts that "[t]he ALJ's
decision includes one passage that might constitute a discussion of
symptom severity[]" (id. at 13), but that "paragraph fails to offer

valid reasons for discounting [Plaintiff's] symptoms" (id. at 14).
(See id. at 13-14 (quoting Tr. 22-23 (detailing Plaintiff's testimony regarding her symptoms)).) Plaintiff additionally challenges the ALJ's evaluation of her activities of daily living, contending that her ability to engage in such activities "is not evidence that she can perform work-related functions on a regular and continuing basis." (Id. at 14.) Finally, Plaintiff faults the ALJ for "rel[ying] heavily on sporadic notations of [Plaintiff] being stable or saying she was doing ok" (id. at 15). (See id. at 15-18.) These contentions fail to justify remand.[8]

As an initial matter, the ALJ's decision contains more than the single paragraph that Plaintiff maintains comprises the entirety of the ALJ's analysis of Plaintiff's symptoms. (See Tr. 22-26.) Furthermore, the ALJ's analysis provides "legally sufficient reasons supported by substantial evidence for finding

_____

[8] Relying on Mascio, Plaintiff additionally asserts that the ALJ erred in "suppl[ying] boilerplate addressing [Plaintiff's] symptom severity." (Id. at 12.) Here, however, the ALJ did not use the "boilerplate" language — namely, that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment" — that the Fourth Circuit has found problematic because such language "'gets things backwards' by implying that ability to work is determined first and is then used to determine the claimant's credibility," Mascio, 780 F.3d at 639 (some internal quotation marks omitted). (See Tr. 22-26.) Moreover, contrary to Plaintiff's contentions, the ALJ bore no obligation to "analyze[ Plaintiff's] credibility" (Docket Entry 8 at 12). See Esque v. Berryhill, No. 1:18cv29, 2018 WL 6201727, at *5 & n.6 (M.D.N.C. Nov. 28, 2018). Finally, Plaintiff argues that "[t]he ALJ improperly only discusses objective medical testing and signs to discount [Plaintiff's] symptoms" (Docket Entry 8 at 14), but, as Plaintiff concedes in her very next sentence, "[t]he ALJ in addressing [Plaintiff's] symptoms [also] mentions she walks, reads, watches television, researches on the internet, does household chores, talks and plays with her grandchildren, and drives to the grocery store and doctor's appointments" (id. (citing Tr. 25)). In sum, these additional arguments entitle Plaintiff to no relief.

[Plaintiff's] testimony not entirely consistent." (Docket Entry 8 at 11 (bold font omitted).) After detailing Plaintiff's testimony regarding her symptoms (see Tr. 22-23), the ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 23.) The ALJ elaborated:

> While the evidence shows that [Plaintiff] has some degree of depression, the [ALJ] cannot accept [Plaintiff's] testimony regarding the severity and limiting effects of her psychiatric symptoms prior to her date last insured. The [ALJ] notes that [Plaintiff] has had at least one inpatient psychiatric hospitalization and has participated in outpatient mental health treatment. However, for the most part the records show that[,] through the date last insured, [Plaintiff's] mental health symptoms were stable when she was compliant and committed to treatment.

(Tr. 23.) The ALJ then detailed Plaintiff's medical records (see Tr. 23-24), which revealed: "a pattern of improvement with treatment" (Tr. 23); repeatedly normal behavior, thought processes, thought content, memory, and attention/concentration (Tr. 23-24); generally effective control of Plaintiff's symptoms through medication (id.); and "no more than moderate but mostly mild symptoms" (Tr. 24). Per the ALJ, the medical records further reflected that "[Plaintiff] reported episodic exacerbations due to psychosocial stressors such as financial stress, but mostly due to her tumultuous relationship with her husband as opposed to

depression and anxiety to the degree of precluding all work."
(Id.)[9]

The ALJ additionally concluded that "a review of the treatment notes reveals that when [Plaintiff] was actively engaged in regular, consistent mental health treatment, her functioning vastly improved. The problem had been consistency and commitment to treatment." (Tr. 24-25.) In this regard, the ALJ found it "[s]ignificant[]" that, "when [Plaintiff] presented to Rowan Psychiatric & Medical Services in August 2013, she reported being hospitalized in May 2013[,] but she also reported being off her medications since January 2013. In December 2014, [Plaintiff] also reported being out of her medications for one week causing an exacerbation in her depressive symptoms." (Tr. 25 (parenthetical citations omitted).) This objective evidence provides "valid reasons for discounting [Plaintiff's description of her] symptoms" (Docket Entry 8 at 14). See, e.g., Sharp v. Colvin, 660 F. App'x 251, 259 (4th Cir. 2016) (finding that substantial evidence supported the ALJ's discounting of the plaintiff's symptom reporting where "the ALJ concluded that [the plaintiff's]

---

[9] Plaintiff maintains that the ALJ failed to consider "what precipitates or aggravates [Plaintiff's] symptoms which [Plaintiff] described in her testimony" (Docket Entry 8 at 15 (citing Tr. 36-41, 45, 49)), but Plaintiff has not identified any particular factor from her testimony that the ALJ neglected to consider (see id. at 14-15). In any event, the ALJ did address factors that Plaintiff identified at the hearing (see Tr. 37 (testifying that, during her manic periods, "sometimes I overspend where I don't have the money[, a]nd then once I spend the money, I go into this depression again")) and in her treatment notes (see, e.g., Tr. 211-14 (identifying marital and financial stressors and lack of medication)) as precipitating and aggravating factors for Plaintiff's symptoms. (See Tr. 22-26.)

statements about the extent of her limitations were not fully supported by objective medical evidence"); Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (affirming the ALJ's decision to discredit the plaintiff's testimony regarding symptom severity where, inter alia, the testimony "[wa]s not supported by any objective medical evidence").

In addition, Plaintiff's "activities of daily living prior to the date last insured" (Tr. 24) contradict her testimony regarding symptom severity. (See Tr. 24-25.) For instance, although Plaintiff "described episodes of depression when she is unable to get out of bed for three weeks at a time" (Tr. 22; see Tr. 37-38)[10] and debilitating fatigue (see Tr. 22, 37-39, 43), the ALJ noted that, "in June 2014[, Plaintiff] reported that she walks everyday" (Tr. 25; see Tr. 258). Further, as stated above, the ALJ found it "[e]ven more significant[]" that Plaintiff testified at the hearing that

> her activities of daily living include reading (an
> average of 5-8 hours), watching a great deal of
> television (an average of 3-5 hours per day) and
> researching information on the internet. [Plaintiff]
> further testified that she performs all household chores
> at times. She said that she loves playing and talking to
> her children and grandchildren and gardening. She also
> said that she drives herself to the grocery store and
> doctor's appointments.

(Tr. 25.)

---

[10] Notably, Plaintiff did not testify that these episodes occurred prior to her date last insured. (See Tr. 37 ("Here lately it's been about . . . three weeks out of a month where I'm incapacitated and where I can't get myself up out of the bed and just live I call it a normal life." (emphasis added)).)

These activities likewise provide "substantial evidence" for the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent" (Tr. 23) with the record. See, e.g., Johnson, 434 F.3d at 658 (upholding finding that the plaintiff's "complaints of pain [were] inconsistent with her testimony of her routine activities," which included, inter alia, "read[ing] books, watch[ing] television, clean[ing] the house, wash[ing] clothes, [and] visit[ing] relatives," explaining that "[t]he ALJ logically reasoned that the ability to engage in such activities is inconsistent with [the plaintiff's] statements of excruciating pain and her inability to perform such regular movements like bending, sitting, walking, grasping, or maintaining attention").

Nevertheless, Plaintiff takes issue with the ALJ's conclusion that "[t]hese activities . . . show that prior to date last insured, when [Plaintiff] was compliant with treatment, she was capable of sustaining basic work activities" (Tr. 25). According to Plaintiff, an ALJ "must explain how he determined that performing certain functions for a short period translates into an ability to perform them for a full workday," but "[t]he ALJ failed to do so here." (Docket Entry 8 at 14 (citing "Mascio" and "Brown v. Comm'r of Soc. Sec., 873 F.3d 251, 263 (4th Cir. 2017)").) In Brown, "the ALJ noted that [the plaintiff] testified to daily activities of living that included 'cooking, driving, doing

laundry, collecting coins, attending church and shopping,'" without
"acknowledg[ing] the extent of those activities as described by
[the plaintiff]," namely "that he simply prepared meals in his
microwave, could drive only short distances without significant
discomfort, only occasionally did laundry and looked at coins,
. . . had discontinued regular attendance at church[,] and limited
his shopping to just thirty minutes once a week." Brown, 873 F.3d
at 263. In addition, "the ALJ provided no explanation as to how
those particular activities — or any of the activities depicted by
[the plaintiff] — showed that he could persist through an
eight-hour workday." Id.

However, unlike in Brown, the record here reflects that
Plaintiff engaged in frequent and prolonged daily activities. For
instance, as previously noted, in June 2014, Plaintiff reported
that she walked each day (Tr. 258), and, at the hearing, Plaintiff
testified that, "[i]n an average 24-hour day," she watches
television "about three to five hours," spends about "five to eight
hours" reading (Tr. 44), and spends "about an hour and a half, two
hours" on the computer, doing "[m]ostly just research" (Tr. 47).
She further testified that she gardens as well as talks and plays
with her children and grandchildren. (Tr. 46-48.) The ALJ
properly "acknowledge[d] the extent of those activities as
described by [Plaintiff]," Brown, 873 F.3d at 263. (See Tr. 21,
25.) He also logically found that the ability to engage in, on

28

average, 9.5 to 15 hours of reading, watching television, and researching on the computer, as well as daily walking, "perform[ing] all household chores at times" (Tr. 25; see Tr. 44), driving herself to doctor's appointments and the grocery store (Tr. 25; see Tr. 42), and "playing and talking to her children and grandchildren and gardening" (Tr. 25), "show that[,] prior to date last insured, when [Plaintiff] was compliant with treatment, she was capable of sustaining basic work activities" (id.). Accordingly, the ALJ did not reversibly err in his analysis of Plaintiff's daily activities.

Finally, Plaintiff argues that "[t]he ALJ relies heavily on sporadic notations of [Plaintiff] being stable or saying she was doing ok," and erroneously "implies that this medical term means [Plaintiff's] conditions had gotten better." (Docket Entry 8 at 15-16.) Plaintiff further argues that "[c]ourts have held as a matter of law that the phrase 'doing well' or is 'stable' cannot be such an inconsistency if the notes show that the claimant is only doing well relative to a prior, poor state." (Id. at 16.) In addition, Plaintiff maintains that the Fourth Circuit "has found that 'isolated references in the physician's notes to "feeling well" and "normal activity" are not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitation.'" (Id. at 18 (quoting Kellough v. Heckler,

785 F.2d 1147, 1153 (4th Cir. 1986)).)  Plaintiff's contentions
fail to justify relief.

As an initial matter, <u>Kellough</u> merely instructs that
references in medical notes such as "'[f]eels well' and 'normal
activity' must be read in context."  <u>Kellough</u>, 785 F.2d at 1153.
Here, however, Plaintiff identifies no specific piece of medical
evidence that the ALJ allegedly took out of context.  (<u>See</u> Docket
Entry 8 at 15-18.)  Additionally, the ALJ used the word "stable"
only twice, including noting that, at a September 2014 appointment,
Plaintiff "reported that she was doing well with stable weight and
improved sleep."  (Tr. 24.)  The ALJ further found that, "for the
most part the records show that through the date last insured,
[Plaintiff's] mental health symptoms were stable when she was
compliant and committed to treatment."  (Tr. 23.)  The medical
evidence discussed above — including "progress notes [that] show a
pattern of improvement with treatment," "changes in [Plaintiff's]
medication regimen [that] were effective in controlling her
symptoms," and "objective examinations [that] have continued to
reveal no more than moderate but mostly mild symptoms" involving
normal mood, affect, and memory, with intact concentration and
judgment and "no evidence of psychosis" (Tr. 23-24) — provide
substantial evidence in support of that conclusion.  (<u>See</u>
<u>also</u> Tr. 25 (noting that, "prior to the date last insured, no

examining or treating physician provided an opinion that the claimant was unable to work").)

"Considered on the record as a whole," <u>Kellough</u>, 785 F.2d at 1153, substantial evidence likewise supports the ALJ's determination that:

> In short, [Plaintiff's] testimony is inconsistent with the objective medical evidence, and in resolving inconsistencies between the objective medical evidence, which presents a longitudinal history of [Plaintiff's] complaints and limitations, and [Plaintiff's] later subjective testimony, which presents a current recollection of those complaints and limitations, the [ALJ] is persuaded that the contemporaneous recordation of those complaints and limitations provided by the objective medical evidence is the more persuasive evidence.

(Tr. 25.) As such, the ALJ did not err in finding Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 23.) The Court thus should reject Plaintiff's final assignment of error.

### III. CONCLUSION

Plaintiff has established no grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Cause for a Rehearing (Docket Entry 7) be denied, that Defendant's Motion for Judgment on the

Pleadings (Docket Entry 9) be granted, and that this case be dismissed with prejudice.

This 27th day of February, 2019.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
